UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


CHARLES FITZGERALD AUSTIN,

      Plaintiff,

          v.

REDFORD TOWNSHIP POLICE
DEPARTMENT, KEVIN G. RILEY,
TIMOTHY L. PAULL, and JOHN M.
MORGAN,

      Defendants.

_____/

CASE NO. 2:08-CV-13236
JUDGE DAVID M. LAWSON
MAGISTRATE JUDGE PAUL J. KOMIVES


**REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (docket #30)**

*Table of Contents*

I.     RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
II.    REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     A.    *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     B.    *Legal Standard* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
     C.    *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
     D.    *Fourth Amendment Claims Against the Individual Officers* . . . . . . . . . . . . . . . . . . . . . . . . 8
          1.    *Sufficiency of Plaintiff's Pleading* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
          2.    *Legal Standard* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
          3.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
               a. Defendant Riley's Initial and Subsequent Deployment of the Taser . . . . . . . . . . . 12
               b. Defendant Paull's Use of the Police Dog . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
               c. Defendant Morgan's Use of the Taser . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
          4.    *Qualified Immunity* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
               a. Legal Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
               b. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
     E.    *Municipal Liability Claim* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
          1.    *Legal Standard* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
          2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
     F.    *Ethnic Intimidation Claim* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
          1.    *Individual Defendants* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
          2.    *The Township* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
     G.    *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
III.   NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

I.      RECOMMENDATION: The Court should grant in part and deny in part defendants' motion for summary judgment.  Specifically, the Court should grant summary judgment to defendants on plaintiff's § 1983 and state law ethnic intimidation claims against Redford Township and plaintiff's § 1983 excessive force claim against defendant Riley based on Riley's first use of a Taser.  The Court should deny summary judgment with respect to plaintiff's remaining § 1983 excessive force claims against defendants Riley, Paull, and Morgan.

II.     REPORT:

A.      *Procedural History*

        Plaintiff Charles Fitzgerald Austin commenced this action on July 29, 2008, by filing a *pro se* civil rights complaint pursuant to 42 U.S.C. § 1983.  After *pro bono* counsel was appointed for plaintiff, he filed through counsel an amended complaint.  Plaintiff's amended complaint names as defendants the Redford Township Police Department ("the Department") and three officers employed by the Department–Kevin G. Riley, Timothy L. Paull, and John M. Morgan. Plaintiff's amended complaint alleges that the individual defendants used excessive force in effectuating his arrest, including deploying Tasers and police dog which bit him.  The amended complaint asserts a municipal liability claim against the Department based on the individual officers' use of excessive force (Count I), and a state law claim of ethnic intimidation pursuant to MICH. COMP. LAWS § 750.147b against the Department and the individual defendants.

        The matter is currently before the Court on defendants' motion for summary judgment, filed on November 29, 2010.  Defendants argue that they are entitled to summary judgment because: (1) the Department is not a proper party; (2) even if plaintiff had properly named the Township as a defendant, there is no genuine issue of material fact with respect to whether the alleged

2

constitutional violation was caused by a policy or custom of the Township; (3) even if plaintiff's complaint can be read as asserting an excessive force claim against the individual officers, their use of force was objectively reasonable and did not violate the Fourth Amendment; (4) the individual defendants are entitled to qualified immunity; and (5) plaintiff has failed to establish a claim of ethnic intimidation under Michigan law. Plaintiff filed a response to defendants' motion on December 20, 2010. Plaintiff contests each of the arguments raised by defendants, and also asks for leave to amend the complaint should the Court determine that he failed to properly allege excessive force claims against the Township and the individual defendants. Defendants filed a reply on January 3, 2011.

B.   *Legal Standard*

Under Rule 56, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Hedrick v. Western Reserve Care Sys.*, 355 F.3d 444, 451 (6th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A fact is material only if its resolution will affect the outcome of the lawsuit." *Hedrick*, 355 F.3d at 451-52 (citing *Anderson*, 477 U.S. at 248). In deciding a motion for summary judgment, the Court must view the evidence in a light most favorable to the non-movant as well as draw all reasonable inferences in the non-movant's favor. *See Sutherland v. Michigan Dep't of Treasury*, 344 F.3d 603, 613 (6th Cir. 2003); *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003). "The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-moving party's case." *Hedrick*, 355 F.3d at 451 (citing *Celotex Corp. v.*

3

*Catrett*, 477 U.S. 317, 323 (1986)).  To meet this burden, the moving party need not produce evidence showing the absence of a genuine issue of material fact.  Rather, "the burden on the moving party may be discharged by 'showing' -- that is, pointing out to the district court -- that there is an absence of evidence to support the non-moving party's case." *Celotex Corp.*, 477 U.S. at 325; *see also* FED. R. CIV. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or . . . showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.").  "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

To create a genuine issue of material fact, however, the non-movant must do more than present some evidence on a disputed issue.  As the Supreme Court has explained: "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the [non-movant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50. (citations omitted); *see Celotex Corp.*, 477 U.S. at 322-23; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  Thus, "[t]he existence of a mere scintilla of evidence in support of the non-moving party's position will not be sufficient; there must be evidence on which the jury could reasonably find for the non-moving party." *Sutherland*, 344 F.3d at 613.

In support of their motion, defendants have submitted videotapes taken from the in-car cameras in the cars of the three individual defendants.  *See* Def.s' Br., Exs. 13-15 [hereinafter

4

referred to, respectively, as "Riley Video," "Paull Video," and "Morgan Video"].  While, as noted above, the Court must take the facts in the light most favorable to plaintiff, "[t]here is . . . an added wrinkle in this case: existence in the record of a videotape capturing the events in question." *Scott v. Harris*, 550 U.S. 372, 378 (2007).  In these circumstances, the Court must also "view[] the facts in the light depicted by the videotape."  *Id.* at 381; *see also*, *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008) ("[W]here, as here, the record contains an unchallenged videotape capturing the events in question, we must only credit the plaintiff's version of the facts to the extent it is not contradicted by the videotape.").

C.    *Factual Background*

Taken in the light most favorable to the plaintiff, the record before the Court establishes the following.  On August 5, 2005, at approximately 9:20 p.m., defendant Riley observed a vehicle driven by plaintiff traveling at approximately 65 miles per hour in a construction zone on Telegraph Road.  Rather than pulling over, plaintiff fled, and Riley initiated a pursuit.  During the course of the chase, plaintiff traveled at a high rate of speed weaving through traffic, including through residential areas and construction zones, ran stop signs and red lights, and at one point traveled the wrong way on Telegraph Road.  After running into a dead end, plaintiff put his car in reverse, striking defendant Riley's vehicle.  Plaintiff then pulled into a driveway and stopped.  Defendant Riley followed, stopping directly behind plaintiff.  *See* Def.s' Br., Ex. 1 (Riley Incident Report); Riley Video, at 21:17:48 - 21:24:28.  By this point in time, a number of other police officers had joined the pursuit, including defendants Paull and Morgan.  *See* Paull Video, at 21:03:51 - 21:07:11;

Morgan Video, 21:05:25 - 21:10:57.[1]  After he came to a stop, plaintiff threw his handgun out the window of the car.  *See* Def.'s Br., Ex. 1; Pl.'s Br., Ex. 2, Dep. Tr. of Charles Austin, at 32-33 [hereinafter "Pl.'s Dep."]; Riley Video, at 21:24:29 - 21:24:32.  Defendant Paull, a K-9 officer, arrived immediately after Riley, and defendant Morgan arrived shortly thereafter.  After stopping and throwing his handgun through the window, plaintiff exited the car.  The Riley video shows the sequence of events which followed.[2]  Riley approached plaintiff holding his Taser drawn.  At the same time, defendant Paull approached with his police dog.  *See* Riley Video, at 21:24:36.  The video shows plaintiff raising one hand in the air, with his palm open.  The video also shows Riley and plaintiff exchanging some words.  Defendant Riley then fires his Taser, striking plaintiff.  Plaintiff falls back into his car, at which time defendant Paull is seen pointing at plaintiff, which causes his dog to jump onto plaintiff.  Paull removes the dog, and the officers, now joined by a third officer, pull plaintiff out of the car and onto the ground.  *See* Riley Video, at 21:24:36 - 21:24:46.  The officers then restrain plaintiff on the ground to handcuff him and secure the scene.  *See* Riley Video, at 21:24:46 - 21:28:22.[3]

While these events are clear from the video, the parties do dispute some particulars which

---

[1]From the time stamps on the videos, it appears that Paull's and Morgan's videos are roughly marked with the same time stamp, but that these two videos differ from the time stamp on Riley's video.

[2]The Riley video contains no sound.  Further, the Paull and Morgan videos do not show the incident in which plaintiff was taken into custody, the view being blocked by police cars in front of their vehicles and a curve in the driveway.  However, these videos do show events after plaintiff was taken into custody, and Morgan's video contains audio as well as video.

[3]At one point, one of the officers is thrown off plaintiff, as if he had been pushed.  *See* Riley Video, at 21: 24:46 - 21:25:08.  It is clear, however, that defendant Paull had became entangled with the Taser wires, and completed the circuit when he grabbed hold of plaintiff.  *See* Def.s' Br., Ex. 5, Dep. Tr. of Timothy Lee Paull, at 15; Morgan Video, at 21:11:33 - 21:11:40 (background audio).  Notably, while plaintiff is on the ground the view from the Riley camera is obscured by plaintiff's vehicle.

are not apparent from the video and the inferences to be drawn from the video. For his part, plaintiff contends that he complied with defendant Riley's verbal commands and did not take any aggressive action, *see* Pl.'s Dep., at 36; that some officers at the scene referred to letting the K9 Unit get some "nigger blood," *see id*. at 36-37; that the K9 unit was deployed on him three times, including once when he was already on the ground, at which point he was bitten in the neck; *see id*. at 56-57; and that Riley deployed the Taser on him a third time while he was pinned on the ground by another officer, *see id*. at 39. Defendants, on the other hand, contend that plaintiff did not comply with Riley's commands to remain still and raised his hands in an aggressive manner, *see* Def.'s Br., Ex. 2, Dep. Tr. of Kevin G. Riley, at 20-21 [hereinafter "Riley Dep."]; the police dog was deployed only once, grabbing hold of plaintiff's forearm, and immediately called back, *see* Def.'s Br., Ex. 2, Paull Incident Report, at 2; Ex. 5, Dep. Tr. of Timothy Lee Paull, at 15-16 [hereinafter "Paull Dep."]; and that the Taser was deployed only twice, the second time when plaintiff attempted to get up from the ground, *see* Def.s' Br., Ex. 1, Riley Incident Report, at 3; Ex. 3, Paull Incident Report, at 2; Riley Dep. at 13-15.

While plaintiff was on the ground, he complained that the cuffs are too tight and that he is unable to breath. One officer responded that plaintiff could breath just fine, as he was talking. The officer checked plaintiff's handcuffs, noting that he could place a finger between the cuffs and plaintiff's wrists. Plaintiff was warned to stop fighting the officers and moving around, or he would be shocked again with the Taser. *See* Morgan Video, at 21:12:25 - 21:15:45. Plaintiff was then escorted to defendant Morgan's car. Plaintiff sat in the rear seat, but refused to put his legs in the car as commanded to do so by defendant Morgan. Defendant Morgan warned plaintiff that he would shock plaintiff with the Taser if he did not comply and put his legs into the car, and sparked the

Taser.  When plaintiff still failed to comply, defendant Morgan administered a "drive stun" of the Taser to plaintiff's sternum.  A second drive stun was administered, at which point plaintiff complied and placed his legs into the vehicle.  *See* Morgan Video, at 21:16:20 - 21:17:00; Def.s' Br., Ex. 7, Morgan Incident Report, at 2.[4]  Plaintiff was transported to the Redford Police Department, where he was charged with fleeing and eluding a police officer, operating a vehicle while intoxicated, and carrying a concealed weapon.  Plaintiff eventually pleaded no contest to the fleeing and eluding and driving while intoxicated charges, and was sentenced to six months' imprisonment. *See* Pl.'s Dep., at 63-64.

D.      *Fourth Amendment Claims Against the Individual Officers*

Defendants first contend that they are entitled to summary judgment with respect to plaintiff's excessive force claims.  Defendants contend that an excessive force claim has not been properly pleaded against the individual officers.  They also contend that even if such a claim has been properly pleaded, there is no genuine issue of material fact with respect to whether their use of force was reasonable.  Finally, they contend that they are entitled to qualified immunity.  The Court should conclude that plaintiff has properly pleaded a Fourth Amendment claim against the individual officers, and that the individual defendants are not entitled to summary judgment on that claim.

1.      *Sufficiency of Plaintiff's Pleading*

Defendants first contend that plaintiff has not properly pleaded a Fourth Amendment excessive force claim against the individual defendants.  The Court should disagree.

---

[4]Because the camera was mounted to the front of the police car, the video does not show plaintiff or defendant Morgan at this point.  However, the tape includes the entire audio recording of the exchange between Morgan and plaintiff.

8

Plaintiff's amended complaint alleges all of the facts which give rise to plaintiff's excessive force claim. *See* Amended Compl., ¶¶ 9-37. The amended complaint also explicitly alleges that the "Redford Township Police Officers used excessive force against Austin during his arrest," *id.*, ¶ 42, that this use of force "was not objectively reasonable under the circumstances," *id.*, ¶ 44, and that the use of force violated the Fourth Amendment, *see id.*, ¶ 45. It is true that these latter allegations are made within a count (Count I) titled "Municipal Liability for Use of Excessive Force (Against the Redford Township Police Department)," but this does not render the complaint insufficient to state a Fourth Amendment claim against the individual defendants. Rule 8 requires that a complaint provide nothing more than "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Importantly, [i]n a complaint, it is not only unnecessary to spell out each legal theory to be relied on, it is also unnecessary to separate each distinct legal theory into a separate count." *Patriarca v. Federal Bureau of Investigation*, 639 F. Supp. 1193, 1198 (D.R.I. 1986); *see also*, 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1219, at 277-78 (3d ed. 2004) ("The federal rules effectively abolish the restrictive theory of the pleadings doctrine, making it clear that it is unnecessary to set out a legal theory for the plaintiff's claim for relief.").

Rather, as the Supreme Court has explained Rule 8 requires only that the complaint contain a "'short and plain statement of the claims' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (quoting FED. R. CIV. P. 8(a)), *overruled in part on other grounds*, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554-63 (2007) . Here, there is no doubt that the individual defendants have had fair notice of plaintiff's claims; defendants' answer to the amended complaint denies the allegations

9

made regarding the conduct of the individual officers, and asserts a defense of qualified immunity, a defense which is applicable only to claims against individual defendants in a § 1983 suit. *See Everson v. Board of Educ. of the Sch. Dist. of the City of Highland Park*, 123 Fed. Appx. 221, 228 n.5 (6th Cir. 2005). Further, plaintiff's municipal liability claim is derivative of his claim against the individual officers, and success on the municipal liability claim requires plaintiff to first establish that the individual defendants violated his constitutional rights. *See Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992) (explaining that "proper analysis requires us to separate two different issues when a § 1983 claim is asserted against a municipality: (1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation."); *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of unconstitutionally excessive force is quite beside the point."). Finally, the parties have engaged in extensive discovery on this issue, and have fully addressed the validity of a Fourth Amendment claim against the individual defendants.

Because (a) plaintiff's complaint provides a short and plain statement of a Fourth Amendment excessive force claim against the individual defendants, (b) the individual defendants have fully litigated the issue, and (c) Rule 8 directs that "[p]leadings must be construed so as to do justice," FED. R. CIV. P. 8(e), the Court should conclude that plaintiff has properly pleaded a Fourth Amendment excessive force claim against the individual defendants. *See generally*, *Conley*, 355 U.S. at 48 ("The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of

pleading is to facilitate a proper decision on the merits.").[5]

2.    *Legal Standard*

The Fourth Amendment provides, in relevant part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]"  U.S. CONST. amend. IV.  In *Graham v. Connor*, 490 U.S. 386 (1989), the Supreme Court held that all claims that police officers used excessive force should be analyzed under the Fourth Amendment.  In analyzing such a claim, the court should apply a standard of objective reasonableness.  *Id*. at 395-96.  This test

> requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

*Id*. at 396; *see also*, *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007).  Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Graham*, 490 U.S. at 396.  "Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, 'its proper application requires careful attention to the facts and circumstances of each particular case.'"  Bell v. Porter, 739 F. Supp. 2d 1005, 1010-11 (W.D. Mich. 2010) (quoting *Graham*, 490 U.S. at 396).  In addition to the underlying historical facts of what happened during the arrest, determination of which is of course a jury question, "[w]hether the amount of force used was reasonable is usually a question of fact to be determined by the jury."  *Forrester v. City of San Diego*, 25 F.3d 804, 806

---

[5]If the Court rejects this conclusion, the Court should nevertheless grant plaintiff's alternative request for leave to file an amended complaint.  As explained below, the individual defendants are not entitled to summary judgment on plaintiff's excessive force claims, and thus leave to amend would not be futile.  Further, there would be no undue prejudice in allowing amendment, as the parties have fully litigated the plaintiff's claims against the individual defendants.

(9th Cir. 1994);

see also, *Dominguez v. Metropolitan Miami-Dade County*, 167 Fed. Appx. 147, 150 (11th Cir. 2006); *Abraham v. Raso*, 183 F.3d 279, 290 (3d Cir. 1999); *Trethewey v. Stimac*, No. 2:08-CV-12156, 2010 WL 3583082, at *4 (E.D. Mich. Aug. 9, 2010) (Komives, M.J.), *magistrate judge's report adopted*, 2010 WL 3583049 (E.D. Mich. Sept. 9, 2010) (Rosen, J.), *aff'd*, ___ Fed. Appx. ___, 2011 WL 2637153 (6th Cir. July 6, 2011). Thus, summary judgment is appropriate only "where the plaintiff fails to offer any evidence that the officer used force or if, accepting the plaintiff's version of events, no reasonable jury could conclude that the officer's use of force was unreasonable." *Trethewey*, 2010 WL 3583082, at *4 (citing *Landy v. Irizarry*, 884 F. Supp. 788, 798 (S.D.N.Y.1995) (citing cases)); *see also*, *Abraham*, 183 F.3d at 290; *Ferraresso v. Town of Granby*,

646 F. Supp. 2d 296, 306 (D. Conn. 2009).

    3.    *Analysis*

Plaintiff contends that the individual defendants used excessive force in three respects. First, plaintiff asserts that defendant Riley's repeated use of the Taser on him was excessive. Second, he argues that defendant Paull's use of the police dog constituted excessive force. Third, he contends that Officer Morgan's use of the Taser while he was seated in the police car was excessive. "In the Sixth Circuit, courts faced with an excessive force case that involves several uses of force must analyze the claims separately." *Landis v. Galarneau*, 687 F. Supp. 2d 672, 678 (E.D. Mich. 2009) (Murphy, J.) (citing *Gaddis v. Redford Twp.*, 364 F.3d 763, 772 (6th Cir.2004)).

        a. *Defendant Riley's Initial and Subsequent Deployment of the Taser*

Here, there is a genuine issue of material fact with respect to whether defendant Riley's

12

initial deployment of the Taser was objectively reasonable.  Looking to the *Graham* factors, a reasonable jury could conclude that defendant Riley's use of the Taser was objectively unreasonable.  First, the initial crime resulting in the arrest was not a violent crime.  To be sure, plaintiff engaged in a dangerous flight from the police, but the initial reason for the pursuit was plaintiff's violation of the traffic laws, and the officers do not contend that they had any basis other than the flight to conclude that plaintiff would be violent.  Second, at the time the force was deployed, the chase had ended, and plaintiff had no visible means of escape.  Further, there remain genuine issues of material fact with respect to whether plaintiff was resisting arrest or otherwise threatening the officers.  The Riley video shows plaintiff raising one arm, with his palm open clearly indicating that he was not holding a weapon in that hand.  Plaintiff did not make any obviously threatening gestures, although his arm gesture may have been threatening to an objectively reasonable officer based on what words were exchanged.  Because there is no audio, however, the tape does not show whether plaintiff's conduct and words together were threatening.  Nor does it appear that at this point, once the chase had ended, plaintiff was attempting to flee the officers on foot.  Further, although defendants Riley and Paull testified that they feared plaintiff was attempting to get his gun, the objective reasonableness of this fear remains a disputed issue of fact in light of the facts that it is not clear how far away the gun was or whether plaintiff ever stepped in the direction of the gun, as well as the fact that the officers had seen plaintiff voluntarily throw the gun from the car.  Indeed, the video shows that although plaintiff exited his car, after he did so he did not take any steps toward defendant Riley.  *See* Riley Video, at 21:24:36-38; rather, as Riley and the police dog approached, immediately before the Taser was fired, plaintiff actually took a step *backward* toward his car.  *See id*. at 21:24:36-37.  Likewise,

13

although the defendants contend that plaintiff was resisting arrest, there remain genuine issues of material fact with respect to whether plaintiff was in fact resisting at the time the Taser was deployed and, if so, to what extent.   Finally, the amount of force used was significant.   In light of these disputed issues of material fact, a jury could conclude that defendant Riley's use of the Taser was objectively unreasonable under the circumstances.   *See Lee v. Metropolitan Gov't of Nashville & Davidson County*, 596 F. Supp. 2d 1101, 1117 (M.D. Tenn. 2009); *Perach v. Lee*, No. 08-13754, 2009 WL 3190414, at *6 (E.D. Mich. Sept. 30, 2009) (Cook, J.); *Michaels v. City of Vermillion*, 539 F. Supp. 2d 975, 986-87 (N.D. Ohio 2008).

More importantly, there is evidence in the record that defendant Riley shocked plaintiff with the Taser a second and possibly a third time, after plaintiff had fallen back into the car or was on the ground.   Even if his first shock of plaintiff was reasonable, there is sufficient evidence from which a jury could conclude that defendant Riley's repeated use of the Taser was objectively unreasonable.   *See Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010); *Kijowski v. City of Niles*, 372 Fed. Appx. 595, 600 (6th Cir. 2010); *Roberts v. Manigold*, 240 Fed. Appx. 675, 676, 678 (6th Cir. 2007); *Yarnell v. Mendez*, 509 F. Supp. 2d 421, 432 (D. Del. 2007).   Although defendants contend that plaintiff was still resisting when he was on the ground, they do not contend that he was physically aggressive, such as by biting, hitting, or kicking.   *Cf. Hinton v. City of Elwood*, 997 F.2d 774, 777 (10th Cir. 1993) (use of Taser objectively reasonable even though plaintiff was on the ground with officers on top of him, where plaintiff was kicking, punching, and biting the officers).   In any event, there remain genuine issues of material fact with respect to whether, and if so to what extent, plaintiff was resisting or threatening the officers when Riley repeatedly deployed the Taser.

14

In short, "[i]t is the province of the jury to assess the credibility of the evidence, and if the jury accepts [plaintiff's] account, it could fairly conclude that to apply a Taser in the situation here presented would constitute the use of excessive force." *Brown v. City of Golden Valley*, 574 F.3d 491, 500 (8th Cir. 2009). Accordingly, the Court should conclude that defendants are not entitled to summary judgment on this excessive force claim.

### b. Defendant Paull's Use of the Police Dog

Defendants also contend that defendant Paull's use of the police dog was objectively reasonable because Paull had seen plaintiff get stunned with Riley's Taser yet start to get back up out of the car, and because Paull was worried that plaintiff was attempting to reach the gun he had thrown out of the car. For the same reasons that defendants are not entitled to summary judgment with respect to defendant Riley's use of the Taser, defendants are not entitled to summary judgment with respect to this use of force. Defendant Paull testified that he deployed the police dog because plaintiff was taking a step toward the firearm and because he saw that the first use of the Taser had no effect on plaintiff. *See* Paul Dep. Tr., at 16-17. However, as explained above, the video shows that plaintiff did not take a step toward Riley, but actually stepped backward as Riley and the police dog approached. *See* Riley Video, at 21:24:35-37. Further, defendant Paull's testimony that he deployed the dog because the Taser had no effect on plaintiff is belied by the video, which shows that dog approaching plaintiff before the Taser was fired, and Paull apparently commanding the dog to seize plaintiff immediately after the Taser was fired and as plaintiff was still falling backward into his car. *See id.* at 21:24:38-41.

It is well established that "[a]n attack by an unreasonably deployed police dog in the course of a seizure is a Fourth Amendment excessive force violation." *Vathekan v. Prince George's*

15

*County*, 154 F.3d 173, 178 (4th Cir. 1998); *see also*, *Campbell v. City of Springsboro, Ohio*, ___ F. Supp. 2d ___, ___, 2011 WL 1575525, at *22 (S.D. Ohio Apr. 26, 2011).  As noted above, there remains a genuine issue of material fact as to whether and to what extent plaintiff was resisting or threatening the officers.  Further, the video appears to show plaintiff standing still or moving backward immediately before the dog was deployed, and the dog was deployed immediately after the Taser had been fired and as plaintiff was falling backward into the car, raising an issue of fact as to whether Paull could have reasonably believed that the Taser did not end the perceived threat posed by plaintiff.  Finally, there is no evidence that Paull gave a verbal warning to plaintiff that he would deploy the dog.  Taken together, these facts, if resolved in plaintiff's favor by a jury, could support a finding that defendant Paull's use of the police dog was not objectively reasonable.  *See Vathekan*, 154 F.3d at 178-79; *Campbell*, ___ F. Supp. 2d at ___, 2011 WL 1575525, at *25-*28; *Morella v. City of Bakersfield*, No. 1:09-cv-00453, 2010 WL 3386465, at *8 (E.D. Cal. Aug. 26, 2010); *Dickinson v. City of Kent*, No. C 06-1215, 2007 WL 1830744, at *3-*5 (W.D. Wash. June 25, 2007); *Blake v. City of New York*, No. 05 Civ. 6652, 2007 WL 1975570, at *4 (S.D.N.Y. July 6, 2007).  Accordingly, the Court should conclude that defendants are not entitled to summary judgment on this claim.

### c.  *Defendant Morgan's Use of the Taser*

Likewise, the Court should conclude that there remains a genuine issue of material fact with respect to whether defendant Morgan's use of the Taser was objectively reasonable.  With respect to this use of force, the record is clear that plaintiff was handcuffed and seated in the back of the police car.  The only justification for the use of the Taser was plaintiff's failure to comply with defendant Morgan's order to place his feet in the car.  There is no evidence that, at this point in time,

16

plaintiff posed a threat to the officers or a risk of flight.  Rather, the use of the Taser was solely as a means of obtaining compliance.  It is well established that "the use of nonlethal, temporarily incapacitating devices on a suspect who is already handcuffed and no longer poses a threat to the safety of the officers or others constitutes excessive force."  *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901 (6th Cir.2004); *see also*, *Kijowski*, 372 Fed. Appx. at 600 ("Absent some compelling justification – such as the potential escape of a dangerous criminal or the threat of immediate harm – the use of such a weapon on a non-resistant person is unreasonable.").  In light of this law, a reasonable jury could conclude that defendant Morgan's use of the Taser to obtain compliance with his verbal command, while plaintiff was subdued and in handcuffs, was objectively unreasonable.  Accordingly, the Court should conclude that defendants are not entitled to summary judgment on this claim.

4.    *Qualified Immunity*

Defendants also contend that summary judgment is warranted because they are entitled to qualified immunity.  The Court should conclude that defendant Riley is entitled to summary judgment on qualified immunity grounds with respect to his initial deployment of the Taser, but that he is not entitled to summary judgment on qualified immunity grounds with respect to his subsequent use of the Taser.  The Court should also conclude that defendants Paull and Morgan are not entitled to qualified immunity.

*a.  Legal Standard*

"Under § 1983 . . . , a plaintiff may seek money damages from government officials who have violated her constitutional or statutory rights.  But to ensure that fear of liability will not unduly inhibit officials in the discharge of their duties, the officials may claim qualified immunity; so long

17

as they have not violated a clearly established right, they are shielded from personal liability." *Camreta v. Greene*, 131 S. Ct. 2020, 2030-31 (2011) (internal quotations and citations omitted). "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, ___, 129 S. Ct. 808, 815 (2009). Thus, "[q]ualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam). The inquiry into whether a particular right is clearly established "'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

In the Fourth Amendment excessive force context, *Graham*'s clear establishment of the general proposition that objectively unreasonable use of force violates the Fourth Amendment "is not enough" to defeat qualified immunity. *Saucier*, 533 U.S. at 202. Rather, the question is whether "the contours" of the broader Fourth Amendment right are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* The question, in other words, "is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.*; *see also*, *Brosseau*, 543 U.S. at 199-200. In order to find that an officer's use of force violated clearly established rights, it is not necessary that "the very action in question has previously been held unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal quotation omitted). Rather, what is required is that "in light of pre-existing law the unlawfulness . . . be apparent." *Id.* (internal quotation omitted). "[A]n action's unlawfulness can be apparent from

direct holdings, from specific examples described as prohibited, or from the general reasoning that

a court employs." *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) (citing *Hope*, 536 U.S. at 740-

41); *see also*, *Grawey v. Drury*, 567 F.3d 302, 313-14 (6th Cir. 2009).

At the summary judgment stage, any subsidiary facts are viewed in the light most favorable

to the plaintiff, and the question of whether the officer violated clearly established law is determined

by reference to the facts as so viewed. *See Champion*, 380 F.3d at 900 ("[W]here the legal question

of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must

determine liability."); *Poe v. Haydon*, 853 F.2d 418, 426 (6th Cir. 1988). In other words, "the

nonmoving party is given the benefit of all relevant inferences at the summary judgment stage, and

if a genuine dispute exists concerning predicate facts material to the qualified immunity issue, the

defendant is not entitled to summary judgment on that ground." *Smithson v. Aldrich*, 235 F.3d 1058,

1061 (8th Cir. 2000) (internal quotation omitted); *cf. Crawford-El v. Britton*, 523 U.S. 574, 598

(1998) (in resolving qualified immunity issue at the pleading stage, "the court must determine

whether, assuming the truth of the plaintiff's allegations, the official's conduct violated clearly

established law.").

### *b. Analysis*

After applying these standards, the Court should conclude that defendants are not entitled

to qualified immunity with respect to defendant Riley's subsequent uses of the Taser, defendant

Paull's use of the police dog, or defendant Morgan's use of the Taser. As noted above, viewing the

evidence in the light most favorable to plaintiff, a jury could conclude that at the time of each of

these events plaintiff was not a threat to the officers or others. Evidence in the record suggests that

after plaintiff was initially shocked by Riley's Taser, he had fallen into his car and no longer posed

19

a threat to the officers necessitating the use of substantial force, *i.e.*, the Taser and the police dog. Likewise, the evidence viewed in the light most favorable to plaintiff suggests that plaintiff posed no significant threat to the officers once he was on the ground. Finally, it is undisputed that plaintiff was handcuffed and sitting in defendant Morgan's car at the time Morgan deployed the Taser. The law is sufficiently clearly established that a reasonable officer would recognize that deploying significant force such as a Taser or police dog constitutes excessive force in such circumstances. As the Sixth Circuit has explained, "there undoubtedly is a clearly established legal norm precluding the use of violent physical force against a criminal suspect who already has been subdued and does not present a danger to himself or others." *Harris v. City of Circleville*, 583 F.3d 356, 367 (6th Cir. 2009) (citing cases); *see also*, *Merithew v. Amore*, ___ Fed. Appx. ___, ___, 2011 WL 11958944, at *4 (6th Cir. Mar. 30, 2011) ("[P]rior opinions clearly establish that it is unreasonable to use significant force on a restrained subject, even if some level of passive resistance is presented."). This law was clearly established at the time of the events in question here. *See, e.g.*, *Bultema v. Benzie County*, 146 Fed. Appx. 28, 37 (6th Cir. 2005); *Champion*, 380 F.3d at 905; *Baker v. City of Hamilton, Ohio*, 471 F.3d 601, 607 (6th Cir. 2006). Because there remain factual questions as to whether plaintiff was sufficiently subdued after the initial deployment of the Taser by Riley that he did not pose a threat to the officers or others, defendants are not entitled to summary judgment on the grounds of qualified immunity. *See Michaels*, 539 F. Supp. 2d at 989-90; *Landis v. Gardoza*, 515 F. Supp. 2d 809, 814-15 (E.D. Mich. 2007) (Feikens, J.), *aff'd*, 297 Fed. Appx. 453 (6th Cir. 2008).

However, the Court should conclude that defendant Riley is entitled to qualified immunity with respect to his initial deployment of the Taser. Although there remain genuine issues of material

fact with respect to whether Riley's initial use of the Taser was objectively reasonable, the law regarding use of a Taser to incapacitate a suspect who has not yet been subdued is insufficiently clear to have put defendant Riley on notice that his initial deployment of the Taser was unlawful. As the Eighth Circuit has explained, "the Taser is a relatively new implement of force, and case law related to the Taser is developing." *Brown*, 574 F.3d at 498 n.5. At the time of the events at issue here, it appears that there existed only four court of appeals decisions addressing the initial use of a Taser to subdue a resistant suspect, each of which found that the use of the Taser did not constitute excessive force. *See Mattos v. Agarano*, 590 F.3d 1082, 1090 (9th Cir. 2010) (discussing *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004); *Hinton*, 997 F.2d at 781-82; *Russo v. City of Cincinnati*, 953 F.2d 1036, 1044-45 (6th Cir. 1992)); *Caldwell v. Moore*, 968 F.2d 595, 600 (6th Cir. 1992). As discussed above the subsequent uses of the Taser or the use of the police dog, under plaintiff's version of the facts, occurred after plaintiff had been incapacitated or subdued and did not pose a threat to the officers. With respect to these circumstances, as noted above, the more general caselaw regarding use of force on an incapacitated or subdued suspect provided clear notice to defendants that their conduct was unlawful. There is, however, no corresponding background of law that would have guided defendant Riley's initial deployment of the Taser beyond the general excessive force test of *Graham*. *Cf. Perach*, 2009 WL 3190414, at *7-*8 (holding that officer was entitled to qualified immunity with respect to initial deployment of Taser based on caselaw upholding such uses but was not entitled to qualified immunity with respect to subsequent uses based on caselaw discussing use of force against a subdued suspect); *McCline v. Roose*, No. 1:07-cv-0545, 2009 WL 585844, at *9-*11 (N.D. Ohio Mar. 6, 2009) (officer not entitled to qualified immunity for subsequent uses of Taser, distinguishing cases which upheld initial use of Taser before

21

suspect had been subdued).

The circumstances confronting defendant Riley at the time he first used the Taser "fall into a grey area about which there does not appear to be clearly established law regarding the appropriate use of force." *McGee v. City of Cincinnati Police Dep't*, No. 1:06-cv-726, 2007 WL 1169374, at *6 (S.D. Ohio Apr. 18, 2007). As the Supreme Court explained in *Saucier*, "qualified immunity operates . . . to protect officers from the sometimes hazy border between excessive and acceptable force." *Saucier*, 533 U.S. at 205-06. In light of the "dearth of prior authority" regarding the acceptable uses of a Taser to incapacitate a suspect who has yet to be subdued, this Court should "conclude that a reasonable officer in [Riley's] position could have made a reasonable mistake of law regarding the constitutionality of the taser use in the circumstances [Riley] confronted in [August] 2005." *Bryan v. McPherson*, 630 F.3d 805, 833 (9th Cir. 2010). Because "it would not have been clear to any reasonable officer . . . that [the initial] use of a Taser in the situation [Riley] confronted was constitutionally impermissible," *Mattos*, 590 F.3d at 1089, the Court should conclude that defendant Riley is entitled to qualified immunity with respect to his initial use of the Taser.

E.   *Municipal Liability Claim*

Defendants also contend that they are entitled to summary judgment with respect to plaintiff's municipal liability claims against the Township. The Court should agree.[6]

---

[6]As an initial matter, defendants are correct that the Department is not a proper defendant, as it is merely a creature of the Township and is not a legal entity capable of being sued. *See Laise v. City of Utica*, 970 F. Supp. 605, 608 (E.D. Mich. 1997) (); *Pierzynowski v. Police Dep't City of Detroit*, 941 F. Supp. 633, 637 n.4 (E.D. Mich. 1996) (Gadola, J.). In such a case, however, the proper course is not to dismiss the claim, but to construe the claim as being asserted against the municipality as the real party in interest. *See Williams v. Northfield Police Dep't*, No. 09-6192, 2010 WL 2802229, at *4 n.1 (D.N.J. July 14, 2010); *Mahan v. Huber*, No. 09-cv-00098, 2010 WL 749810, at *4 (D. Colo. Mar. 2, 2010); *Pierzynowski*, 941 F. Supp. at 637 n.4; *cf. Brandon v. Holt*, 469 U.S. 464, 469-71 (1985). Indeed, by naming the Department

1.    *Legal Standard*

The Supreme Court has recently explained the standards when a plaintiff asserts a § 1983

claim against a municipality:

> A municipality or other local government may be liable under this section if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation. *See Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 692 (1978). But, under § 1983, local governments are responsible only for "their own illegal acts." *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986) (citing *Monell*, 436 U.S., at 665–683). They are not vicariously liable under § 1983 for their employees' actions. *See id.*, at 691; *Canton [v. Harris]*, 489 U.S. [378], at 392 [(1989)]; *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997) (collecting cases).
>
> Plaintiffs who seek to impose liability on local governments under § 1983 must prove that "action pursuant to official municipal policy" caused their injury. *Monell*, 436 U.S., at 691; *see id.*, at 694. Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law. *See ibid.*; *Pembaur*, *supra*, at 480-481; *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-168 (1970). These are "action[s] for which the municipality is actually responsible." *Pembaur*, *supra*, at 479–480.
>
> In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983. A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train. *See Oklahoma City v. Tuttle*, 471 U.S. 808, 822-823 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*"). To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Canton*, 489 U.S., at 388. Only then "can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.*, at 389.
>
> "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bryan Cty.*, 520 U.S., at 410. Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city

---

as a defendant, plaintiff has effectively named the Township. *Cf. Haverstick Enterprised, Inc. v. Financial Federal Credit, Inc.*, 32 F.3d 989, 992 n.1 (6th Cir. 1994) ("A suit against a city police department in Michigan is one against the city itself, because the city is the real party in interest").

employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. *Id.*, at 407. The city's "policy of inaction" in light of notice that its program will cause constitutional violations "is the functional equivalent of a decision by the city itself to violate the Constitution." *Canton*, 489 U.S., at 395 (O'Connor, J., concurring in part and dissenting in part). A less stringent standard of fault for a failure-to-train claim "would result in de facto respondeat superior liability on municipalities . . . ." *Id.*, at 392; *see also Pembaur*, *supra*, at 483 (opinion of Brennan, J.) ("[M]unicipal liability under § 1983 attaches where–and only where–a deliberate choice to follow a course of action is made from among various alternatives by [the relevant] officials . . .").

*Connick v. Thompson*, 131 S. Ct. 1350, 1359-60 (2011) (parallel citations omitted).

2.    *Analysis*

Plaintiff raises both a general policy and custom claim, and a failure to train claim.  In his amended complaint, plaintiff alleges that "the Department has policies, practices and customs relating to the use of Tasers as well as the use of K9 units," and that these policies were "the moving force behind the use of Tasers and the deployment of the K9 unit against Austin."  Amended Compl., ¶¶ 48-49.  He also alleges that "the Department failed to train Redford Township Police Officers on the proper use of Tasers and K9 units."  *Id*., ¶ 50.

Taking plaintiff's failure to train claim first, the Court should conclude that plaintiff's municipal liability claim fails as a matter of law.  As noted above, to establish a municipality's liability on a failure to train theory, plaintiff must show that the allegedly inadequate training amounted to "deliberate indifference" on the part of the Township.  "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train."  *Connick*, 131 S. Ct. at 1360 (quoting *Bryan County*, 520 U.S. at 409); *see also*, *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824 (1985) (plurality opinion) (footnotes omitted) ("[W]here the policy relied upon is not itself unconstitutional,

24

considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality and the causal connection between the 'policy' and the constitutional deprivation"; *id*. at 833 (Brennan, J., concurring in part) ("[T]here may be many ways of proving the existence of a municipal policy or custom that can cause a deprivation of a constitutional right, but the scope of § 1983 liability does not permit such liability to be imposed merely on evidence of the wrongful actions of a single city employee not authorized to make city policy."). As the *Connick* Court explained, while policymakers' "'continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action–the 'deliberate indifference'–necessary to trigger municipal liability,' . . . [w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick*, 131 S. Ct. at 1360 (quoting *Bryan County*, 520 U.S. at 407).

Here, plaintiff points to no similar incidents suggesting that the Township knew of and disregarded any inadequacies in their training program. Nor does he point to any other evidence suggesting that the training was inadequate. As support for his claim, plaintiff points only to defendant Morgan's statement to plaintiff in the police car that he deployed the Taser based on plaintiff's "[f]ailure to comply to verbal command, sir – my training . . . . I ask you, I told you, that's all I need, thank you." Morgan Video, at 21:17:19-25. At most, however, this statement shows that Morgan was inadequately trained or that, although properly trained, he misunderstood the training. This is not sufficient to show that the Township's training was so inadequate as to amount to deliberate indifference. As the Court explained in *Canton*,

25

> [i]n resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program. It may be, for example, that an otherwise sound program has occasionally been negligently administered. Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.

*Canton*, 489 U.S. at 390-91 (citations omitted). Here, plaintiff has pointed to no inadequacies in the training program beyond the conduct alleged in his complaint, nor does he point to any other incidents "demonstrating that the [Township] has ignored a history of abuse and was clearly on notice that the training in this particular area was clearly deficient and likely to cause injury." *Miller v. Sanilac County*, 606 F.3d 240, 255 (6th Cir. 2010). Thus, plaintiff's municipal liability claim based on a failure to train theory fails as a matter of law.

Likewise, plaintiff's municipal policy claim fails as a matter of law. To establish municipal liability based on a municipal policy, plaintiff must show that the policy was the "moving force" behind the constitutional violation by establishing "a direct causal link between a municipal policy or custom and the alleged constitutional violation." *Canton*, 489 U.S. at 385. Plaintiff argues that the Department's "Less than Lethal Use of Force Policy," Pl.'s Br., Ex. 13 [hereinafter "Force Policy"]. was the moving force behind the constitutional violations because that policy authorizes the use of a Taser in certain circumstances. This argument is without merit. Plaintiff's argument seeks to impose liability on the basis of a showing of "but for" causation. *Canton*'s requirement that a plaintiff prove "a *direct* causal link," however, requires more. *See Mann v. Helmig*, 289 Fed.

Appx. 845, 850 (6th Cir. 2008) (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1388 (4th Cir. 1987))
("[P]roof merely that such a policy or custom was 'likely' to cause a particular violation is not
sufficient; there must be proven at least an 'affirmative link' between policy or custom and violation;
in tort principle terms, the causal connection must be 'proximate,' not merely 'but-for'
causation-in-fact."); *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 837 (9th Cir. 1996) ("Pointing to
a municipal policy action or inaction as a 'but for' cause is not enough to prove a causal
connection."); *Fraire v. City of Arlington*, 957 F.2d 1268, 1281 (5th Cir. 1992) ("This connection
must be more than a mere 'but for' coupling between cause and effect.").[7]  As the Fourth Circuit
explained in *Spell*, the challenged policy must be one that made the ultimate violation "almost bound
to happen, sooner or later, rather then merely likely to happen in the long run."  *Spell*, 824 F.2d at
1390 (internal quotation omitted).

Apart from his "but for" causation argument, plaintiff has pointed to nothing which shows
that the policy was the "moving force" behind the alleged constitutional violation, and the language
of the policy does not support such a conclusion.  The Force Policy begins by stating that "[i]t is the
policy of this Department to employ the minimum amount of force, reasonable and necessary, to
overcome resistance offered in effecting a lawful arrest or in the lawful performance of duty."  Force
Policy, § II.  The Policy then provides guidelines on the authorized use of less than lethal force.  *See
id.*, § III.  More specifically, the Policy explicitly states that less than lethal force may be used
against a person only "when alternatives to the use of force have failed or are not available to the

---

[7]"When a municipal 'policy or custom' is itself unconstitutional, i.e., when it directly commands
or authorizes constitutional violations, the causal connection between policy and violation is manifest
and does not require independent proof."  *Spell*, 824 F.2d at 1387 (citations omitted).  Plaintiff does not
contend that the Township's policy is itself unconstitutional on its face "in this strict sense," and thus
the policy "must be independently proven to have caused the violation."  *Id.* at 1387-88.

officer." *Id*., § III(A)(1)-(3).  The Policy further explains, setting forth the *Graham* standard, that "[t]he question is whether the officer's actions are 'objectively reasonable' in light of ALL the facts and circumstances confronting the officer, at the time the force was used," *id*., § III(B)(1), and sets forth an extensive though non-exclusive list of factors that may be considered, *see id*., § III(B)(2). The Force Policy provides additional guidance by setting forth a use of force continuum, dividing subject actions into four categories (inactive resistance, passive resistance, active resistance, and active aggression) and officer responses into five categories (presence/verbal direction, compliance controls, physical controls, intermediate controls, and deadly force), and explaining what each category means.  *See id*., § III(F).  The Policy also provides extensive guidance on the use of Tasers in 13 separate subparagraphs.  *See id*., § III(H)(2)(a)-(m).  Specifically, the Policy states that a Taser: "is considered a less than lethal weapon, but it is a weapon and shall not be used indiscriminately," *id*., § III(H)(2)(a); may not be used unless the officer "has completed the prescribed training and has demonstrated competency in handling, firing, and providing first aid to subjects," *id*., § III(H)(2)(b); and may be used only "after soft empty hand control has been unsuccessfully attempted," unless "circumstances indicate that a higher level of control is required and can be articulated."  *Id*., § III(H)(2)(c).

In light of this language, "there can be little doubt that on its face the [Township's] policy regarding [use of force] is constitutional."  *Canton*, 489 U.S. at 386.  The Force Policy explicitly adopts the *Graham* test, and provides extensive guidance to officers on the circumstances in which various forms of force may be employed.  "It is difficult to see what constitutional guarantees are violated by such a policy."  *Id*. at 387.  Even if the individual defendants "happened to apply the policy in an unconstitutional manner," the Township is not liable on this basis alone, "for liability

28

would then rest on *respondeat superior*." *Id.* Because the Force Policy "mirrors the constitutional standard," it is constitutional on its face. *Cordova v. Aragon*, 569 F.3d 1183, 1194 (10th Cir. 2009); *see also*, *Denning v. Metropolitan Gov't of Nashville & Davidson County*, 564 F. Supp. 2d 805, 817 (M.D. Tenn. 2008), *aff'd*, 330 Fed. Appx. 500 (6th Cir. 2009).

Finally, plaintiff cannot establish the Township's liability based on the Force Policy's failure to specifically address the use of police dogs. "Plaintiff[] point[s] to no authority that the failure to create policies in a certain area can constitute an unconstitutional custom or practice." *Hobart v. City of Stafford*, ___ F. Supp. 2d ___, ___, 2011 WL 1638606, at *13 (S.D. Tex. Apr. 29, 2011). On the contrary, a plaintiff "cannot survive summary judgment on [a] *Monell* claim by simply relying on the lack of a written policy." *Boyd v. Denton County*, 374 F.3d 773, 784 (9th Cir. 2004); *see also*, *Roper v. Hynes*, No. 05 Civ. 7664, 2006 WL 2773032, at *11 (S.D.N.Y. Sept. 27, 2006) ("the lack of a written policy does not be itself establish the deliberate indifference required by *Brown*."). Here, there is no question that the general provisions of the Force Policy govern any use of force, and thus the use of the police dog. Further, as explained above, defendant Paull testified that he received specialized training in the use of the police dog, and plaintiff has failed to offer any evidence that this training was inadequate. Because there is "no evidence that the [Township] deliberately failed to train or control its officers as to when and how to deploy" a police dog, the lack of written policy alone is insufficient to impose liability on the Township. *Boyd*, 374 F.3d at 784. Accordingly, the Court should grant summary judgment with respect to plaintiff's claim against the Township.

F.    *Ethnic Intimidation Claim*

Finally, defendants contend that they are entitled to summary judgment with respect to

29

plaintiff's state law ethnic intimidation claim.  The Court should conclude that the Township is entitled to summary judgment with respect to this claim, but that the individual defendants are not.

1.   *Individual Defendants*

In his second cause of action, plaintiff asserts a claim against all defendants under Michigan's ethnic intimidation statute, which provides:

> A person is guilty of ethnic intimidation if that person maliciously, and with specific intent to intimidate or harass another person because of that person's race, color, religion, gender, or national origin, does any of the following:
> (a) Causes physical contact with another person.
> (b) Damages, destroys, or defaces any real or personal property of another person.
> (c) Threatens, by word or act, to do an act described in subdivision (a) or (b), if there is reasonable cause to believe that an act described in subdivision (a) or (b) will occur.

MICH. COMP. LAWS § 750.147b(1).  Although the statute is one imposing criminal liability, it also provides for a civil cause of action:

> Regardless of the existence or outcome of any criminal prosecution, a person who suffers injury to his or her person or damage to his or her property as a result of ethnic intimidation may bring a civil cause of action against the person who commits the offense to secure an injunction, actual damages, including damages for emotional distress, or other appropriate relief. A plaintiff who prevails in a civil action brought pursuant to this section may recover both of the following:
> (a) Damages in the amount of 3 times the actual damages described in this subsection or $2,000.00, whichever is greater.
> (b) Reasonable attorney fees and costs.

MICH. COMP. LAWS § 750.147b(3).  There is little case law applying § 750.147b at all, and an even greater dearth of authority applying the statute in a civil action.  It is clear, however, that to succeed on this claim plaintiff must show that the defendants (1) caused physical contact with him or threatened to do so, and (2) did so with the specific intent to harass or intimidate him on the basis of his race.  *See Brooks v. Pickett*, No. 06-15633, 2008 WL 937356, at *12 (E.D. Mich. Apr. 7,

2008) (Roberts, J.). Defendants contend that plaintiff's ethnic intimidation claim fails as a matter of law on both elements.

Taking the second element first, the Court should conclude that there remain genuine issues of material fact with respect to whether any of the defendants' actions were taken with the specific intent to harass or intimidate plaintiff on the basis of his race. Plaintiff testified in his deposition that during the encounter officers said "teach him what – the N word, what happens when you run from us;" "let the dog get some nigger blood;" and "Nigger, that's what happen [sic] when you run from us." Pl.'s Dep. Tr., at 36-37, 42. Defendants contend that this evidence is not credible because plaintiff "was very intoxicated, no doubt clouding his memory," Def.'s Br., at 15, and themselves deny using any racial slurs or hearing any other officer use a racial slur. *See* Riley Dep. Tr., at 18; Paull Dep. Tr., at 19; Morgan Dep. Tr., at 25. This, however, presents a credibility issue improper for resolution on a motion for summary judgment. The only question here is whether, if the jury accepts plaintiff's testimony, the jury could find the intent element of the ethnic intimidation statute satisfied. And the little case law interpreting the ethnic intimidation statute makes clear that defendants' use of racial slurs, if true, is sufficient to support a finding that one or more of the defendants acted with the intent to harass or intimidate plaintiff based on his race. *See Brooks*, 2008 WL 937356, at *12; *People v. Foust*, No. 289997, 2010 WL 2219681, at *2 (Mich. Ct. App. June 3, 2010) ("Defendant's use of the slur could certainly be found by a rational trier of fact to show that he had the specific intent to target Rodriguez because of his race or national origin. The use of the slur immediately following the contact serves to reinforce this conclusion."); *People v. Schutter*, 265 Mich. App. 423, 430-31, 695 N.W.2d 360, 364 (2005) ("Defendants' use of racial epithets and directives to "[r]emember this" give rise to a reasonable inference that defendants specifically

31

intended to beat Robinson because of his race."); *People v. Stevens*, 230 Mich. App. 502, 506, 584 N.W.2d 369, 371 (1998).

This conclusion is not altered by the Morgan video. As defendants correctly note, the Morgan video fails to substantiate plaintiff's claim, because in the video Morgan is heard talking in a deferential tone to plaintiff, using no racial slurs and addressing him as "sir." The audio from Morgan's car, however, does not include the entire incident, most notably the initial confrontation between plaintiff and the officers when plaintiff exited his car. Thus, while the Morgan video does not substantiate plaintiff's claim, neither does it preclude the claim. Nor is this conclusion altered by the fact, as argued by defendants, that this incident was motivated not be racial animosity but by plaintiff's flight from the police and failure to submit to their authority once he was pulled over. While it is likely true that the initial motivations of the officers were based solely on these factors, the ethnic intimidation statute contains "no limiting language to suggest that ethnic intimidation may only be charged when the specific intent to intimidate or harass is [the] only reason for the underlying predicate criminal act." *Schutter*, 265 Mich. App. at 430, 695 N.W.2d at 364. Notably, the intent can be formed during the physical contact itself, regardless of any other antecedent motivations. *See id*. As discussed above, plaintiff has presented evidence of a specific intent to intimidate on the basis of his race, and "[w]hen this specific intent to intimidate [plaintiff] on the basis of his race is combined with the accompanying [use of force], it can reasonably be inferred that what may have started out as merely road rage escalated into an act of ethnic intimidation." *Id*. at 431, 695 N.W.2d at 364.

The more difficult question here is whether plaintiff has presented evidence sufficient to present a jury question on the first element of his claim. The statute broadly prohibits any "physical

contact" motivated by racial animosity.  There is no question that defendants caused "physical contact."  However, in *People v. Richards*, 202 Mich. App. 377, 509 N.W.2d 528 (1993) (per curiam), the Michigan Court of Appeals rejected a challenge to the statute on the grounds that it was unconstitutionally vague by construing the statute to be "satisfied only when there is evidence of an underlying *predicate criminal act* committed because of racial animosity."  *Id*. at 379, 509 N.W.2d at 529 (emphasis added); *see also*, *Brooks*, 2008 WL 937356, at *13 ("[T]he constitutionality of M.C.L. § 750.147b relies, in part, on the existence of an underlying predicate criminal offense."); *Devoe v. Rebant*, No. 05-71863, 2006 WL 334297, at *8 (E.D. Mich. Feb. 13, 2006) (Duggan, J.) (explaining, in reliance on *Schutter* and *Richards*, that "Section 750.147b is a penal statute that makes it a crime for someone to commit a criminal act because of racial or other ethnic animosity."); *Stevens*, 230 Mich. App. at 505, 584 N.W.2d at 371.

The question, therefore, is whether plaintiff has presented evidence that defendants committed an underlying criminal act.  Defendants argue that he has not, because they did not use excessive force.  *See Devoe*, 2006 WL 334297, at *8 (finding plaintiff could not show that defendants acted unlawfully where their use of force was objectively reasonable under the Fourth Amendment).  As explained above, however, there remain genuine issues of material fact with respect to whether the force used by defendants was objectively reasonable, and thus excessive under the Fourth Amendment.

This alone, however, does not end the inquiry, as the ethnic intimidation statute would be satisfied not if the use of unconstitutionally excessive force was *unlawful* in the sense of being unconstitutional, but if the use of such force itself constitutes a *criminal* act.  Because defendants rely solely on their argument that no Fourth Amendment violation has been established, the parties

33

do not more specifically discuss whether the defendants committed an underlying criminal violation, beyond plaintiff's general assertion that the underlying predicate criminal act is assault and battery. *See* MICH. COMP. LAWS § 750.81(1). Another possible underlying predicate criminal act is the common law crime, applicable to police officers, of misconduct in office. *See People v. Milton*, 257 Mich. App. 467, 471, 668 N.W.2d 387, 390 (2003); *cf. People v. Coutu*, 459 Mich. 348, 353-57, 589 N.W.2d 458, 461-62 (1999). At this stage, without briefing from the parties on these issues, it would be premature to make this determination. As noted above, defendants bear the initial summary judgment burden of demonstrating the absence of a genuine issue of material fact. With respect to the first element of plaintiff's ethnic intimidation claim, they have done so only by relying on their argument that they did not use excessive force in violation of the Fourth Amendment. Because genuine issues of material fact exist as to this issue, and because defendants have not at this stage argued that their conduct is not covered by the ethnic intimidation statute if it is found to be unconstitutionally excessive force, the Court should conclude that the individual defendants are not entitled to summary judgment on plaintiff's state-law ethnic intimidation claim.[8]

2.   *The Township*

The Court should conclude, however, that the Township is entitled to summary judgment with respect to this claim. The statute provides that "[a] person" is guilty of ethnic intimidation if the elements of the statute are met. Because the statute is part of the Penal Code, it is governed by

---

[8]Because of the dearth of authority interpreting § 750.147b, as well as the apparent lack of any Michigan cases discussing whether an officer's use of excessive force constitutes a criminal act under the assault and battery, misconduct in office, or other criminal statutes, the Court may wish to consider whether it should certify one or more questions of law regarding these issues to the Michigan Supreme Court pursuant to MICH. CT. R. 7.305(B), or whether it is appropriate to decline to exercise supplemental jurisdiction over this state law claim pursuant to 28 U.S.C. § 1367(c)(1) (court may decline to exercise supplemental jurisdiction over claim raising novel or complex issue of state law).

the definitional provisions set forth in MICH. COMP. LAWS § 750.10.  *See People v. Ghosh*, 188 Mich. App. 545, 546, 470 N.W.2d 497, 498 (1991) (per curiam).  Under that statute, for purposes of the Penal Code "[t]he words 'person', 'accused', and similar words include, unless a contrary intention appears, public and private corporations, copartnerships, and unincorporated or voluntary associations."  MICH. COMP. LAWS § 750.10, para. 3.  Notably absent from this definition are governmental units or agencies.  *Compare* MICH. COMP. LAWS § 8.3*l* (setting forth general rule of construction that "[t]he word 'person' may extend and be applied to bodies politic and corporate, as well as to individuals.").  Thus, a Township is not a "person" who may be liable under § 750.147b.  Further, the civil action provision of the statute permits a suit only "against the person who commits the offense," indicating in clear terms that "the civil liability contemplated by this Act is personal rather than vicarious."  *Owens v. Fraser Public Schools*, No. 94-CV-71872, 1995 WL 871216, at *12 (E.D. Mich. Oct. 31, 1995) (Hackett, J.).  Accordingly, the Court should conclude that plaintiff's ethnic intimidation claim against the Township fails as a matter of law.

G.    *Conclusion*

In view of the foregoing, the Court should conclude that there are no genuine issues of material fact with respect to plaintiff's § 1983 and ethnic intimidation claims against the Township, and that the Township is entitled to judgment as a matter of law.  Likewise, the Court should conclude that even taking the facts in the light most favorable to plaintiff, defendant Riley is entitled to qualified immunity with respect to his initial use of the Taser on plaintiff.  Accordingly, the Court should grant defendants' motion for summary judgment with respect to these claims.  With respect to the remaining § 1983 excessive force claims and the ethnic intimidation claims against the individual defendants, the Court should conclude that there remain genuine issues of material fact

precluding summary judgment, and thus the Court should deny defendants' motion with respect to these claims.

III.      NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


                                                    s/Paul J. Komives
                                                    PAUL J. KOMIVES
                                                    UNITED STATES MAGISTRATE JUDGE

Dated: 7/18/11

36

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record and by electronic means or U.S. Mail on July 18, 2011.

s/Eddrey Butts
Case Manager